UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA,
          Plaintiff

vs.                              Case No. 1:19-mj-05051-1

LUIS BERROA,
          Defendant

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE JUDITH G. DEIN
AT BOSTON, MASSACHUSETTS
ON MARCH 19, 2019

APPEARANCES:

For the Plaintiff:
Katherine H. Ferguson, Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210
617-748-3555

For the Defendant:
James B. Krasnoo, Esquire
Krasnoo, Klehm & Falkner, LLP
28 Andover Street, Suite 240
Andover, Massachusetts 01810
978-475-9955

ALSO PRESENT:
Gabriel Hadad, Interpreter


Transcriber:  Karen M. Aveyard,
              Approved Federal Court Transcriber

-------------------------------------------------------

**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**
**k.aveyard@comcast.net**

<u>I N D E X</u>

| Witness: | Direct | Cross |
|---|---|---|
| Sergeant Leo Sacco | | |
| (By Ms. Ferguson) | 4 | |
| (By Mr. Krasnoo) | | 14 |

<u>E X H I B I T S</u>

| No. | | Page |
|---|---|---|
| 1 | Affidavit of Special Agent Hardy | 9 |
| 2 | Affidavit of Michael J. Dunn | 9 |
| 3 | Photograph of pink box and Fentanyl | |
| 4 | Photograph of open pink box, finger press and Fentanyl | 9 |
| 5 | Photograph of .40 caliber Taurus pistol | 9 |
| 6 | Photograph of Defendant's driver's license | 9 |

<u>P R O C E E D I N G S</u>

1

2

3          THE CLERK:  The United States District Court for the

4     District of Massachusetts is now in session on March 19, the

5     year 2019, in the matter of the United States of America versus

6     Luis Berroa, Criminal Case No. 2019-5051.

7               Could counsel please identify themselves for the

8     record.

9               MS. FERGUSON:  Good afternoon, your Honor.  Kate

10    Ferguson on behalf of the Government.

11              MR. KRASNOO:  Good afternoon, your Honor.  James

12    Krasnoo for the defendant, Luis Berroa, who is present with me

13    at counsel table.

14              THE COURT:  Good afternoon.  Let's swear in the

15    interpreter, please.

16              MR. KRASNOO:  Your Honor, I would only request,

17    because Ms. Ferguson faces straight ahead, she could keep her

18    voice up a little bit.  I'm soon to get hearing aides, but I

19    (inaudible).

20              THE COURT:  Okay.  If you can't hear, just move over.

21              (The Interpreter was sworn.)

22              THE CLERK:  Could you identify yourself for the

23    record.

24              THE INTERPRETER:  Gabriel Hadad.

25              THE CLERK:  Thank you.

1              THE COURT:  Alright.  So we're scheduled for a

2    probable cause and detention hearing.  Are we proceeding?

3              MS. FERGUSON:  I believe that we are, your Honor, yes.

4              THE COURT:  Would you call your first witness, please.

5              MS. FERGUSON:  Yes, your Honor.  The Government calls

6    Sergeant Leo Sacco.

7              (The Witness was sworn.)

8              THE CLERK:  Please state your full name, spelling your

9    last name for the record.

10             THE WITNESS:  Leo Sacco III, S-A-C-C-O.

11             **DIRECT EXAMINATION OF SERGEANT LEO SACCO**

12   **BY MS. FERGUSON:**

13   **Q.**   Good afternoon.  Are you currently employed?

14   **A.**   Yes, ma'am.

15   **Q.**   By whom?

16   **A.**   With the City of Medford.

17   **Q.**   In what capacity do you work for the City of Medford?

18   **A.**   I'm the Detective Sergeant in charge of the Drug Control

19   Unit.

20   **Q.**   It's with the police department?

21   **A.**   For the police department, yes, ma'am.

22   **Q.**   How long have you been with the Medford Police Department?

23   **A.**   Going on 13 years.

24   **Q.**   For how long have you been in the Drug Unit there?

25   **A.**   Since 2012.

1    **Q.**    Do you have any other assignment at this point in time?

2    **A.**    Right now I'm assigned to the DEA out of Boston, Task

3    Force 1.

4    **Q.**    And that's the Drug Enforcement Administration?

5    **A.**    Yes.

6    **Q.**    For how long have you been a Task Force Officer with the

7    DEA?

8    **A.**    Three and a half years.

9    **Q.**    What are your responsibilities generally as the Sergeant

10    Detective in charge of the Medford Police Drug Control Unit and

11    a Task Force Officer of the DEA?

12    **A.**    Well, as the Detective Sergeant in Medford, we try to

13    identify more street-level drug distribution, handle all

14    confidential informants that work and have signed up with the

15    City of Medford, to work with the captain with Asset

16    Forfeiture.  I have two detectives that work for me.  I oversee

17    all of their investigations.

18         As a Task Force Officer, myself and other agents, we

19    try to target more mid-level wholesale drug distributors and we

20    use the same means, confidential sources, Title 3 wire

21    intercepts, undercover purchases, electronic surveillance,

22    mobile surveillance.

23    **Q.**    Fair to say that generally speaking, your responsibilities

24    include investigating violations of the state and federal drug

25    laws?

1  **A.**   Yes, ma'am.

2  **Q.**   Have you received training during your time with the

3  police department and DEA?

4  **A.**   Yes, I have.

5  **Q.**   Could you briefly describe your training.

6  **A.**   At present I have approximately 400 to 500 hours in the

7  field of narcotics.  I've attended classes on undercover

8  investigations, pharmaceutical drug diversion, drug

9  identification.  These classes have been put on both by the

10  U.S. Attorney's Office, the DEA, with the Middlesex District

11  Attorney's Office.

12         I have worked personally in an undercover capacity.  I

13  have been the affiant in over two dozen search warrants, both

14  at the state and federal level; provided expert testimony in

15  the field of narcotics to the Middlesex DA's Office.  I have

16  arrested approximately 200 narcotics offenders.

17  **Q.**   Are you familiar with the defendant, Luis Berroa?

18  **A.**   Yes.

19  **Q.**   How are you familiar with him?

20  **A.**   He was involved in an ongoing drug investigation with Task

21  Force 1.  There was a search warrant executed at his residence

22  on March 13th of last week.

23  **Q.**   And you participated in that investigation?

24  **A.**   Yes, ma'am.

25  **Q.**   That was primarily conducting surveillance at various

1    points in time?

2    **A.**    Yes, ma'am.

3    **Q.**    Could you briefly describe the investigation that

4    culminated and Mr. Berroa's arrest.

5    **A.**    Yes, ma'am.  Members of Task Force 1 identified a

6    confidential source who was able to purchase narcotics, and as

7    a result we were able to apply for, and were granted, search

8    warrants at various locations for drugs.

9    **Q.**    The confidential source was making controlled purchases

10   from Encebio Esperitusanto; is that right?

11   **A.**    Yes, ma'am.

12   **Q.**    And you said that you identified a number of different

13   locations that were connected to those purchases?

14   **A.**    Yes, ma'am.

15   **Q.**    Did you obtain search warrants?

16   **A.**    Yes, we did.

17   **Q.**    And that was for two locations?

18   **A.**    Yes.

19   **Q.**    Do you recall the addresses of those locations?

20   **A.**    Yes.  It was 3 Newton, Apartment 2, in Lawrence, and 141

21   Newton, I believe it was the second floor.

22   **Q.**    Did you obtain a search warrant for the first floor at 141

23   Newton?

24   **A.**    Initially, yes, ma'am.

25              MS. FERGUSON:  Your Honor, may I approach?

1          THE COURT:  Yes.

2          MR. KRASNOO:  I'll stipulate.

3    BY MS. FERGUSON:

4    **Q.**   I've handed you several exhibits.  I'd ask you to look at

5    the one that is marked Government Exhibit 1.

6    **A.**   Yes, ma'am.

7    **Q.**   Do you recognize that?

8    **A.**   I do.

9    **Q.**   What is it?

10   **A.**   It's the affidavit in support of the search warrant.  It

11   was Special Agent Hardy's affidavit.

12   **Q.**   Have you reviewed that affidavit?

13   **A.**   Yes, I have.

14   **Q.**   To the best of your knowledge, information and belief, is

15   it true and accurate?

16   **A.**   Yes.

17          MS. FERGUSON:  At this time, I would seek to admit

18   Government Exhibit 1.

19          THE COURT:  Any objection?

20          MR. KRASNOO:  No, your Honor.  In fact, I don't object

21   to any of the five exhibits that I was shown.

22          THE COURT:  So why don't we consider them all marked

23   then.

24          MS. FERGUSON:  And just for the record, you should

25   have six.  There's four photographs and two --

1          MR. KRASNOO:  Let me just double check.

2          (Pause.)

3          MR. KRASNOO:  That's correct, your Honor, I'm sorry.

4    There are six, not five, and I stipulate to the admission of

5    all of them.

6          THE COURT:  Alright.  So we'll mark Exhibits 1 through

7    6.

8          MS. FERGUSON:  Thank you, your Honor.

9          **(Exhibit Nos. 1 through 6 admitted.)**

10   BY MS. FERGUSON:

11   **Q.**    Directing your attention to Paragraphs 26 through 29 of

12   Exhibit 1, did the confidential source make a controlled

13   purchase of drugs on February 28, 2019?

14   **A.**    Yes.

15   **Q.**    Where did that controlled purchase take place?

16   **A.**    At 3 Newton in Lawrence.

17   **Q.**    Was it in Apartment 2 specifically at 3 Newton Street?

18   **A.**    Yes.

19   **Q.**    You mentioned that agents thereafter obtained a search

20   warrant for 3 Newton Street, Apartment 2; is that right?

21   **A.**    That's correct.

22   **Q.**    Was that search warrant executed?

23   **A.**    Yes.

24   **Q.**    What day?

25   **A.**    On March 13, 2019.

1    **Q.**    Are you aware who was inside of Apartment 2 at 3 Newton

2    Street when agents arrived to execute the search warrant?

3    **A.**    Yes, I am.

4    **Q.**    Who was that?

5    **A.**    There were two gentlemen, Mr. Luis Berroa and also a

6    Mr. Wilfredo Ramirez.

7    **Q.**    Where were Mr. Berroa and Mr. Ramirez at the time that

8    agents entered the apartment?

9    **A.**    Each gentleman was in their respective bedroom.

10    **Q.**    And it's a two-bedroom apartment?

11    **A.**    Yes.

12    **Q.**    Did agents recover anything from the apartment that day?

13    **A.**    Yes, we did.

14    **Q.**    Generally speaking, what was recovered?

15    **A.**    Approximately 50 grams of a white powder substance, which

16    was field tested positive for Fentanyl.  There was a finger

17    press, there was two firearms and ammunition, and

18    identification.

19    **Q.**    Directing your attention to Paragraph 7 of Exhibit 2,

20    where was the Fentanyl located within the apartment?

21    **A.**    The majority of the Fentanyl was located in the drop

22    ceiling in Mr. Berroa's bedroom.

23    **Q.**    And that's the bedroom where he was in bed when agents

24    entered the apartment?

25    **A.**    Yes.

1   **Q.**   Can you describe more specifically what agents located?

2   **A.**   Up in the drop ceiling there was a pink box which

3   contained a white powder substance which we believed to be

4   Fentanyl, which was later field tested positive for Fentanyl,

5   and a finger press.

6   **Q.**   And just asking you to take a look at Government

7   Exhibit 3, what does that depict?

8   **A.**   It's the pink box, as well as a package of white powdery

9   substance, which was field tested positive for Fentanyl.

10  **Q.**   Was that picture taken up inside the drop ceiling?

11  **A.**   Yes, it is.

12  **Q.**   Directing your attention to Exhibit 4, what's that?

13  **A.**   That is the box that's open.  Inside is the finger press,

14  as well as some more white powder substance tied up in a white

15  plastic bag, which field tested positive for Fentanyl.

16  **Q.**   What's a finger press?

17  **A.**   A finger press is a machine that's used by drug

18  distributors to package approximately 10 grams of a controlled

19  substance at a time.

20  **Q.**   And inside that pink box, was there in fact a so-called

21  finger that was already packaged?

22  **A.**   Yes, ma'am.

23  **Q.**   You mentioned that agents recovered firearms that day?

24  **A.**   Yes.  There were two firearms located in the bedroom

25  closet of Mr. Berroa.

1   **Q.**   Where within the closet were those firearms?

2   **A.**   In a duffle bag.

3   **Q.**   Are you aware of what types of firearms they were?

4   **A.**   There was a Taurus .40 caliber semi-automatic pistol which

5   was located, as well as a Jimenez .380 semi-automatic pistol

6   which was located.

7   **Q.**   Were those firearms loaded?

8   **A.**   No, they were not.

9   **Q.**   Were the clips in the guns?

10  **A.**   Yes.

11  **Q.**   Did you locate or agents locate any ammunition?

12  **A.**   Yes, they did.  In a sock in the same duffle bag, there

13  was .380 ammunition.

14  **Q.**   Were there any drugs located in that same closet in that

15  bedroom?

16  **A.**   There was a small package of Fentanyl located in a shirt

17  pocket, as well as some prescription pills believed to be

18  Xanax.

19  **Q.**   You mentioned that agents recovered certain identification

20  documents that day?

21  **A.**   Yes, ma'am.

22  **Q.**   Did those include a United States -- well, sorry, let me

23  just ask you to back up for one second and look at Exhibit 5.

24          What is depicted in Exhibit 5?

25  **A.**   This is the .40 caliber Taurus pistol that was located in

1   the duffle bag in the bedroom closet.

2   **Q.**   And you mentioned the identification documents that were

3   recovered that day?

4   **A.**   Yes.

5   **Q.**   Did those include a United States Passport for Mr. Berroa?

6   **A.**   Yes.

7   **Q.**   Where was that located?

8   **A.**   That was located on the dresser in the bedroom where

9   Mr. Berroa was staying.

10  **Q.**   That's the same bedroom where the drugs and the firearms

11  were located?

12  **A.**   Yes, ma'am.

13  **Q.**   Did agents also locate Mr. Berroa's driver's license?

14  **A.**   Yes.  Mr. Berroa directed agents to his vehicle outside.

15  Inside the Honda, which was registered to him, there were more

16  identification that we located.

17  **Q.**   Is that what's depicted in Government Exhibit 6?

18  **A.**   Yes, ma'am.

19  **Q.**   Was anything located in the second bedroom in the

20  apartment?

21  **A.**   Yes.

22  **Q.**   Can you describe what was located in that bedroom.

23  **A.**   There was a package of a white powdery substance which

24  turned out to be a cutting agent.  I believe that there might

25  have -- there was one pill believed to be a Fentanyl pill which

1   was located in that bedroom.  Also, a sum of U.S. currency

2   which we believe to be fake, or fraudulent.

3   **Q.**   And just to be clear for the record, were you at 3 Newton

4   Street that day when the search warrant was executed?

5   **A.**   No, I was not.

6   **Q.**   Where were you?

7   **A.**   I was at another location in Lawrence.

8   **Q.**   You were executing a search warrant at another location?

9   **A.**   Yes.

10          MS. FERGUSON:  I have nothing further for this witness

11  at this time.

12          THE COURT:  Cross-examination?

13          **CROSS-EXAMINATION OF SERGEANT LEO SACCO**

14  **BY MR. KRASNOO:**

15  **Q.**   Do you know Agent Duff, sir?

16  **A.**   Agent Duff, Counselor?  No.

17  **Q.**   Do you know Michael -- I'm sorry.  Do you know a Michael

18  J. Dunn?

19  **A.**   Yes, I do.

20  **Q.**   Is he present today?

21  **A.**   No, he's not.

22  **Q.**   Do you know where he is?

23  **A.**   He is -- I know where he was earlier today.  I don't know

24  where he is presently.

25  **Q.**   Where was he earlier today?

1  **A.**   I believe he was up in Andover.

2  **Q.**   So was he working?

3  **A.**   Yes, in the cap -- yeah, as a DEA agent he was in Andover.

4  **Q.**   He wrote the affidavit that's marked Government Exhibit 2;

5  did he not?

6  **A.**   Yes.

7  **Q.**   He wrote that affidavit after the search occurred, right?

8  **A.**   Yes, sir.

9  **Q.**   And he was present at the search of 3 Newton Street; was

10  he not?

11  **A.**   I don't call if he was -- I don't know where he was on

12  that particular day.  I wasn't at 3 Newton.

13  **Q.**   He wasn't with you, was he?

14  **A.**   He was not, no.

15  **Q.**   Were you at 141 Newton?

16  **A.**   No, I was not.

17  **Q.**   You were at another location?

18  **A.**   Yes, I was.

19  **Q.**   And what location was that?

20  **A.**   That was -- I was at two locations.  I was at 12 Woodland

21  Court, which was a residence in Lawrence, Massachusetts, as

22  well as an apartment in 131 Berkley Street.  I forget what the

23  apartment number was, but I --

24  **Q.**   131?

25  **A.**   131 Berkley.

1   **Q.**   Berkley.

2          Sir, how long have you been connected to this

3   investigation that involved Encebio Esperitusanto?

4   **A.**   I was present on one of the controlled buys, but I had

5   minimal participation.  I was out injured for a period of time

6   at the end of 2018.

7   **Q.**   Directing your attention to Officer Hardy's affidavit, are

8   you able to tell us, was one of the buys recounted in there one

9   of them that you were present at?

10  **A.**   I believe so.  I don't know which one it was.

11  **Q.**   There's a November 8th purchase, a November 21st purchase

12  and a February 8th purchase, and a February -- yes, a February

13  28th -- February 8th and February 28th purchase.

14  **A.**   May have been the February 8th.  I'd have to check my

15  notes.  But it wasn't the February 28th.

16  **Q.**   And there was a controlled buy is what you were present

17  for; is that correct?

18  **A.**   Yes.

19  **Q.**   Now, in your entire involvement in this case, had you

20  known of the name of Luis Berroa before the day of the search?

21  **A.**   No, sir.

22  **Q.**   You had never seen him when you were on surveillance?

23  **A.**   No, I hadn't.  No.

24  **Q.**   You never heard his voice on any telephone call connected

25  to this investigation?

1    **A.**    No, Counselor.

2    **Q.**    Had you heard any telephone conversations of

3    Esperitusanto?

4    **A.**    The recordings?

5    **Q.**    Yes.

6    **A.**    No, but I know that the confidential source contacted

7    Mr. Esperitusanto.

8    **Q.**    And you have no knowledge that the confidential informant

9    ever contacted Mr. Berroa, right?

10    **A.**    That's correct.

11    **Q.**    Now, in the Hardy affidavit, there are three people who

12    are listed as unidentified males.  Do you have any reason to

13    believe on the basis or the knowledge (inaudible) your case

14    that the unidentified male described that way on three

15    occasions were Mr. Berroa on any one of the three occasions?

16    **A.**    I don't believe agents -- I know I personally have never

17    seen Mr. Berroa as the unidentified male.

18    **Q.**    Now -- I'm sorry.

19         When you came to the 3 Newton Street, you were

20    familiar with the exterior of the premises; were you not?

21    **A.**    No, Counselor.

22    **Q.**    No?

23    **A.**    I was never at 3 Newton Street.

24    **Q.**    But there were other agents who actually had done

25    surveillance on 3 Newton Street; is that correct?

1    **A.**    Yes.

2    **Q.**    And there were agents that had done surveillance on 141

3    Newton Street; is that correct?

4    **A.**    Yes.

5    **Q.**    In all of those surveillances, no one ever reported to you

6    that they ever saw Mr. Berroa involved in anything while they

7    were under surveillance; is that correct?

8    **A.**    That is correct.

9    **Q.**    Now, you mentioned earlier that you found money in a room

10    other than the room in Mr. Berroa's; is that correct?

11    **A.**    Yes, agents did discover some U.S. currency in another

12    room.

13    **Q.**    Do you know whether they discovered any U.S. currency in

14    Mr. Berroa's room?

15    **A.**    I don't believe so.

16    **Q.**    Now, earlier you described the duffle bag as Mr. Berroa's,

17    you said it was his duffle bag.  Can you tell me what

18    information you've got to indicate to you that it was his

19    duffle bag as opposed to a duffle bag found in a closet in his

20    room in which he was sleeping?

21    **A.**    That's what I believe I was trying to -- it was that it

22    was the duffle.  I should not have said it was Mr. Berroa's

23    bag.  I don't recall saying that, but it was located, the

24    duffle bag was located, in Mr. Berroa's bedroom.

25    **Q.**    Now, you also mentioned that the bulk of the drugs was in

1    the fake ceiling; is that correct?

2    **A.**    Yes, Counselor.

3    **Q.**    No one ever described to you when they first entered that

4    room that in some way it indicated that the fake ceiling had

5    been moved at all; is that correct?

6           In other words, there was no indication that anyone

7    had been up there recently; is that correct?

8    **A.**    That's correct, I don't believe so.

9    **Q.**    You have no way to -- did you know at the time you came to

10   this premises how long Mr. Berroa had been living in the

11   apartment house?

12   **A.**    No, I have no knowledge of that.

13   **Q.**    Did you know who were the renters of the apartment house?

14   **A.**    No, Counselor, I do not.

15   **Q.**    So there was no checking on that by the investigators

16   before they executed the search warrant; is that correct?

17   **A.**    I believe I had spoken to one of the Task Force Officers

18   involved, Task Force Officer Brian Canearny (PHONETIC), who had

19   stated that he had done surveillance at 3 Newton Street prior

20   to the execution of the search warrant and at some point

21   observed Mr. Berroa's vehicle parked out front.  But as far as

22   who was on the lease, or who owns that property or rents that

23   property, I don't know, and I don't believe that Task Force

24   Officer Canearny did either.

25   **Q.**    Is it fair to state that the way you got to 3 Newton

1    Street was because the investigation had indicated that there

2    had been activity by Encebio Esperitusanto at both 3 Newton and

3    141 Newton, and 277 Salem Street?

4    **A.**    That's correct.  I believe on one of the occasions

5    Esperitusanto, Mr. Esperitusanto, had directed the confidential

6    source to 3 Newton Street.

7    **Q.**    Now, you also know from the investigation that there were

8    other people who were listed as Encebio Esperitusanto's

9    co-conspirators; is that correct?

10    **A.**    Yes.

11    **Q.**    And one of them was a Mr. Batista, who was physically

12    present when a transaction occurred between the confidential

13    informant and Mr. Encebio Esperitusanto; isn't that correct?

14    **A.**    Yes.

15    **Q.**    You also mentioned that there was a Mr. LeBron (PHONETIC)

16    who was identified because he had participated in the securing

17    of a box from the United States Post Office in some way and

18    carried it to one of the buildings; is that correct?

19    **A.**    Yes.

20    **Q.**    You had no information to indicate that Mr. Berroa was a

21    co-conspirator of Mr. Encebio Esperitusanto, or Mr. LeBron or

22    Mr. Batista, at any time before you came to the house; is that

23    correct?

24    **A.**    That's correct.

25    **Q.**    So basically what -- is it fair to state that what you

1    know is that you entered a room at 3 Newton Street and you

2    found a person sleeping on a bed in a bedroom with documents

3    there indicating that he was the possessor of the bedroom with

4    stuff in the ceiling that wasn't showing with no information to

5    indicate that he knew of its presence or did not know of its

6    presence; is that correct?

7    **A.**    Could you rephrase that question, please?

8    **Q.**    Sure.  Let me break it down.

9           When you came -- when the agents came into the

10   premises for the purposes of executing the warrant, they found

11   two bedrooms; is that correct?

12   **A.**    Yes, sir.

13   **Q.**    One of them involved a person who was not arrested; is

14   that correct?

15   **A.**    Yes, that is correct.

16   **Q.**    The other involved a bedroom where Mr. Berroa was sound

17   asleep at that time; is that correct?

18   **A.**    Yes, that is also correct.

19   **Q.**    And in that bedroom the drugs and finger press were found

20   in a fake ceiling; is that correct?

21   **A.**    Correct.

22   **Q.**    Not visible to any occupant until a portion of the ceiling

23   was moved; is that correct?

24   **A.**    Yes.

25   **Q.**    In addition, there were found guns in a duffle bag in a

1    closet; is that correct?

2    **A.**    Yes.

3    **Q.**    There was no currency found in that room; is that correct?

4    **A.**    I don't believe so.  That is also correct.

5    **Q.**    There were no tools or drug paraphernalia other than the

6    finger press that were found; is that correct?

7    **A.**    Yes, that is also correct.

8    **Q.**    So there were no baggies and no cutting agents in

9    Mr. Berroa's room, no razor blades to do any cutting with; is

10    that correct?

11    **A.**    Yes, sir.

12    **Q.**    You found one cell phone belonging to Mr. Berroa in that

13    room; isn't that correct?

14    **A.**    I don't recall how many cell phones or electronic devices

15    were located in that room.

16    **Q.**    But is it fair to state, based on your vast experience,

17    that normally people active in the drug trade have more than

18    one cell phone, that's quite common?

19    **A.**    That is common, yes, sir.

20    **Q.**    And you don't know how many cell phones were found here

21    that connect to Mr. Berroa, do you?

22    **A.**    That's correct.

23    **Q.**    You found the guns.  Both were empty; is that correct?

24    **A.**    Yes.

25    **Q.**    You don't know whose duffle bag that was, but it was

1    located in the closet of the bedroom where Mr. Berroa was

2    sleeping; is that correct?

3    **A.**   Yes, sir.

4    **Q.**   In addition, in the dresser of that bedroom you found his

5    passport; is that correct?

6    **A.**   Yes, sir.

7    **Q.**   But you found in another -- it was found in another room

8    some identification of him; is that correct?

9    **A.**   I believe he --

10          THE COURT:  I lost that.  I'm sorry, I didn't follow

11   that.

12          MR. KRASNOO:  Okay.

13          THE COURT:  The passport was in the drawer in the

14   bedroom?

15          MR. KRASNOO:  That's correct.

16          THE COURT:  And then what happened?

17   BY MR. KRASNOO:

18   **Q.**   Then there's other identification of Mr. Berroa that was

19   found in another room; isn't that correct?

20   **A.**   I know of the identification that he directed agents to

21   which was in his vehicle.

22   **Q.**   Well, wasn't that his license, but was that also the

23   Dominican identification?

24   **A.**   That's what I have here, yes, as well as his -- it looks

25   like a labor and his work ID.

1    **Q.**    But other than what I've described, there's no further

2    information you can offer this Court to show that he was tied

3    in with any drug conspiracy; is that correct?

4    **A.**    Other than the drugs that were located in that room, there

5    was nothing, no.

6    **Q.**    Right.  And you know of nothing that indicates that at any

7    time before, up to the time of the execution of the warrant, he

8    participated in a sale of drugs in any way?

9    **A.**    That's correct.

10   **Q.**    That he was a knowing recipient of drugs in any way?

11   **A.**    That's correct.

12   **Q.**    You don't have any information to indicate that he put it

13   in the ceiling; is that correct?

14   **A.**    I don't, no.  No, that's correct.

15   **Q.**    And you don't have any information to indicate that the

16   guns in the duffle bag belonged to him?

17   **A.**    I don't, no.  At this time, I don't.

18   **Q.**    You don't know whose shirt it was where a little amount of

19   Fentanyl was found?

20   **A.**    Again, I can only make the assumption based on the size of

21   the shirt and the size of Mr. Berroa that the shirt was

22   probably Mr. Berroa's.

23   **Q.**    Did you see the shirt?

24   **A.**    I saw photos of the shirt.

25   **Q.**    You saw photos of the shirt?

1    **A.**    Yes.

2    **Q.**    But you don't know whether or not it actually fit him; is

3    that correct?

4    **A.**    That's correct.

5    **Q.**    And nobody made him put it on, right?

6    **A.**    No, sir.

7            MR. KRASNOO:  May I have just a moment, your Honor?

8            THE COURT:  Yes.

9            (Pause.)

10           MR. KRASNOO:  I have no further questions of this

11    witness, your Honor.

12           THE COURT:  Anything further?

13           MS. FERGUSON:  Nothing further from the Government,

14    your Honor.

15           THE COURT:  You may step down.

16           THE WITNESS:  Thank you, your Honor.

17           THE COURT:  Does the Government have any further

18    evidence?

19           MS. FERGUSON:  No, your Honor.

20           THE COURT:  Does the defendant have any witnesses?

21           MR. KRASNOO:  No, your Honor.

22           THE COURT:  Alright.  I'll hear from the Government.

23           MS. FERGUSON:  Thank you, your Honor.

24           With respect to probable cause, the Government would

25    submit that there's ample evidence here today, your Honor, to

1    support a finding of probable cause.  Mr. Berroa is charged

2    with possession with intent to distribute Fentanyl.

3              THE COURT:  You need to slow down for the translator,

4    please.

5              MS. FERGUSON:  I'm sorry.

6              Mr. Berroa is charged with possession with intent to

7    distribute Fentanyl.  Your Honor heard that in the

8    investigation that led to agents seeking a search warrant for

9    3 Newton Street, Apartment 2, there was a controlled purchase

10   of drugs that took place within that apartment.  You heard that

11   when agents went to execute the search warrant, that they

12   obtained -- they located Mr. Berroa asleep in the apartment.

13   It was a two-bedroom apartment.  There were two occupants, each

14   asleep in one of the bedrooms.

15             You heard that in the bedroom where Mr. Berroa was

16   sleeping agents located his passport.  They also located a

17   quantity of Fentanyl, approximately 50 grams of Fentanyl, in a

18   couple of different locations, some in the drop ceiling and

19   some in a shirt that was in the closet.

20             You heard also that in the drop ceiling agents located

21   a finger press, which Sergeant Sacco testified is a tool that

22   drug traffickers use to prepare drugs for distribution.  You

23   heard that there was a finger already prepared there in the

24   ceiling.

25             You also heard that in the closet of the bedroom where

1    Mr. Berroa was sleeping there were two firearms and ammunition

2    for one of the firearms that were located in a duffle bag, as

3    well as a smaller quantity of Fentanyl that was located in a

4    shirt that was hanging in the closet.

5         Your Honor, you heard that Mr. Berroa directed agents

6    to his other identification.  It was located in his car.  The

7    car was parked outside.  It was registered to Mr. Berroa at

8    3 Newton Street, Apartment 2.  You can see from Government

9    Exhibit 6 that Mr. Berroa's driver's license indicates that he

10   resides at 3 Newton Street, Apartment 2, in Lawrence.

11        Your Honor, for all of these reasons, the Government

12   does submit that there is ample evidence to support a finding

13   of probable cause in this case.

14        I can address detention now or separately.

15        THE COURT:  Let's address probable cause first and

16   then we'll do detention.

17        Mr. Krasnoo?

18        MR. KRASNOO:  Your Honor, where the Government's proof

19   is lacking is that they have to show that there was possession.

20   Possession requires an intent to dominate and control.  It's

21   not enough that it's physically present in a ceiling.  It must

22   be shown in some way that the person who is sleeping in the bed

23   intends to control either its whereabouts, or protect it in

24   some way or utilize it in some way.  There's nothing here that

25   shows that.

1          The same with the guns in the closet.  There's no

2     showing that my client was made aware of their presence at the

3     time he was sleeping.  There's no showing who put them there.

4     There's no showing whose they are.  There's no showing that

5     there was any use of them.

6          Now, they obviously would be able to show an intent to

7     dominate and possess and control the drugs if they could show

8     in some way he took any other action that made him a part of

9     the conspiracy with Encebio Esperitusanto, but they can't.

10    They never see him on the street doing the surveillance.  They

11    never find him physically present.  There's no information that

12    he was ever on the phone.  There's no information that he's got

13    any dilutants or cutting agents or drug paraphernalia in his

14    room that's visible that shows he was using them or has

15    knowledge of their existence in his room.  The items that they

16    find are not items that are visible to sight unless somebody

17    put them there in his presence, and they can't show that.

18         So when you take the raw possession that they're

19    inferring merely because he's in the room, that's not enough to

20    cause a probable cause analysis because they must show the

21    elements of possession and intent to dominate and control in

22    some way, and they don't have that.  There's no question that

23    it's there --

24         THE COURT:  Alright.  Well, I think what's lacking

25    from your argument is an explanation for his driver's license

1    and the fact that he reports that he lived there, right.  I

2    mean, that -- so it's not a neighbor who just kind of crashed.

3            THE COURT:  No, no, he does live there, your Honor.

4    In fact, I have information to indicate that he rents the

5    apartment from his sister and her husband, who occupy the other

6    room, and that he had lived there for some time, some months.

7    But that's not enough still to show the dominating and

8    possession.

9            Now, the driver's license is in his vehicle.  It's not

10   in the room.  But his passport is in that room.  And yes, his

11   identification that connects him to the room, but it doesn't

12   necessarily connect him to the drugs.

13           It's quite possible that someone else put the drugs in

14   the fake ceiling.

15           THE COURT:  His sister?

16           MR. KRASNOO:  Sorry?

17           THE COURT:  His sister who is living in the other

18   room?

19           MR. KRASNOO:  No, but we know from the affidavit that

20   you've got before you on Hardy that Esperitusanto comes to

21   3 Newton Street.  He comes when he's doing controlled buys with

22   the confidential informant when no one else is there.  Batista

23   might be there on one occasion, but neither Wilfredo is there,

24   nor my client is there.

25           So what's to say that that isn't where Encebio stores

1    them without the occupants of the apartment knowing that?  When

2    you get two plausible hypotheses, one consistent with guilt and

3    one consistent with lack of guilt, fairness dictates that you

4    go with the lack of guilt.  That's the old Commonwealth versus

5    Croft principle and that's here.

6         They can't show any fingerprints by my client on the

7    box.  They can't show any fingerprints by my client on the

8    guns.  Granted guns are difficult to have fingerprints very

9    often, but they're not showing that.  They don't have anything

10   to show that merely because they're in that room in a hidden

11   way that my client has knowledge of their existence, never mind

12   in some way controlled them.  All they can show is he's there

13   at the time.

14        Under state law it's not a crime to be present where

15   drugs are so long as you're not involved with them, okay.  The

16   Federal Court is a little thinner in that area and less

17   charitable to defendants than the State Court to be sure, but

18   nevertheless, on the facts here for probable cause, this is too

19   weak a case to survive at this point.

20        THE COURT:  Ms. Ferguson, do you want to respond?

21        MS. FERGUSON:  Your Honor, the standard here today is

22   probable cause.  We're not here for trial.

23        MR. KRASNOO:  I need you louder, I'm sorry.

24        MS. FERGUSON:  I'm sorry.  The standard here today is

25   probable cause.  We're not here for trial.  It is not proof

1    beyond a reasonable doubt.  I point that out first.

2         Second, it's not really a particularly credible

3    argument to suggest that someone came into Mr. Berroa's

4    apartment without his knowledge, was storing a distribution

5    quantity of drugs in the apartment, as well as firearms in a

6    duffle bag in Mr. Berroa's closet, and Mr. Berroa had no

7    knowledge of it.  I mean, that just isn't really consistent

8    with common sense.

9         So at this time we would ask the Court to find

10   probable cause.

11        THE COURT:  I do find probable cause here.  I

12   appreciate your argument, Mr. Krasnoo, but I think that given

13   that there's clear evidence of a drug sale there, there is a

14   large quantity of drugs in the ceiling, the firearm in the

15   duffle bag, that leads me to -- the logical inference is that

16   this defendant certainly had access to both the drugs and the

17   guns, or he was working with the defendant who was using the

18   apartment to sell the drugs.

19        So he wasn't there?  Like, he left the apartment so

20   that the apartment could be used for the drugs?  I'm not sure

21   what logical explanation you're asking me to find, but for now

22   I don't find an equally innocent and not innocent explanation

23   for this.  I do believe that there's sufficient evidence that

24   the defendant did possess with intent to distribute a

25   distribution quantity of Fentanyl.

1          So that's the probable cause finding.  On detention?

2          MR. KRASNOO:  Note my objection.

3          THE COURT:  Hmm?

4          MS. FERGUSON:  I think he just said note my objection,

5     your Honor.

6          THE COURT:  Oh, okay.

7          MS. FERGUSON:  With respect to detention, your Honor,

8     the Government is moving both on risk of flight and

9     dangerousness grounds for Mr. Berroa's detention.

10    Acknowledging that Mr. Berroa has no prior criminal history,

11    the Government would make note of the fact that Mr. Berroa is

12    charged currently with possession with intent to distribute

13    Fentanyl.  You heard that it was approximately 50 grams of

14    Fentanyl that was located in the apartment.  That quantity

15    would support an indictment on a mandatory minimum carrying a

16    charge if he were indicted for possession with intent to

17    distribute 40 grams or more of Fentanyl.  That would carry a

18    five-year mandatory minimum sentence.

19         In addition, the firearms were located in the same

20    bedroom as the drugs, and so the Government's position would be

21    that that would support an indictment for a violation of

22    924(c), two violations, in fact, of 924(c), each of which would

23    also carry a mandatory minimum sentence that would be

24    consecutive to the sentence imposed on the drug charge.  So

25    Mr. Berroa, essentially, will be looking at at least a ten-year

1    mandatory minimum sentence after indictment, and that certainly

2    gives him an incentive, your Honor, not to appear in court.

3         That, coupled with Mr. Berroa's ties to the Dominican

4    Republic, in the Government's view does make him an

5    unacceptable flight risk at this point in time.  He does note

6    in his interview with Pretrial Services his ties to the

7    Dominican Republic.  His mother, I believe, is living there.

8    He travels to the Dominican Republic on a regular basis, has

9    done so for the past ten years.

10        THE COURT:  Do we have any false identification or

11   anything like that?

12        MR. KRASNOO:  I'm sorry, I could not hear your Honor.

13        THE COURT:  Do we have any evidence of any false or

14   alternative identification?

15        So if the passport is taken by Probation, is there any

16   evidence that he has access to an alterative identification?

17        MS. FERGUSON:  I don't have any evidence -- there's no

18   evidence before the Court at this point in time about the use

19   of an alias or anything of that nature.

20        THE COURT:  Okay.

21        MS. FERGUSON:  The Government also, as I said, is

22   moving on the basis of dangerousness to the community.  This is

23   a case involving Fentanyl, which, as the Court is well aware,

24   is really one of the biggest threats facing the Commonwealth at

25   this point in time.  The evidence, in the Government's view,

1    suggests and indicates that Mr. Berroa was involved with the

2    distribution of Fentanyl, and that is, in and of itself, a

3    danger to the community.  We have people dying of overdoses at

4    an alarming rate and Fentanyl really is, as I said, just one of

5    the largest dangers at this point in time that the Commonwealth

6    is facing.

7            In addition, Mr. Berroa was in possession of two

8    firearms.  They weren't loaded, but ammunition for one of the

9    firearms was right there with it in the same bag.  Given the

10   fact that he was in possession of both the drugs and the guns,

11   the Government would argue that he does pose an unacceptable

12   risk of danger to the community, and, in the Government's view,

13   there is no condition or combination of conditions that would

14   reasonably assure Mr. Berroa's appearance in court or the

15   safety of the community.  As a result, we are asking that he be

16   detained pending trial.

17           THE COURT:  Mr. Krasnoo?

18           MR. KRASNOO:  Yes, your Honor.

19           My client, your Honor, is 23 years old with no prior

20   criminal record.  Your Honor has vast experience in determining

21   the strengths and weaknesses of these cases.  This is not the

22   strongest case that's ever come down the pike for the Federal

23   Government to be sure, for the reason that they find a man

24   asleep in bed and they cannot show that any of the drugs --

25   while there's a permissible inference, as your Honor found for

1    probable cause, that's not the standard for trial, in terms of

2    the ultimate success of the case.

3            THE COURT:  Talk into the mic.

4            MR. KRASNOO:  I'm sorry.

5            Proof beyond a reasonable doubt would be a hard burden

6    of proof for the Government to follow in this case, given the

7    absence of any activity by Mr. Berroa during this several month

8    long investigation that went on where he never surfaces in any

9    capacity at all.  That's number one.

10           Number two, your Honor, yes, his mother is located in

11   the Dominican and he goes to see his mother once a year, I

12   suspect that if any of us have a parent that lives out of

13   state, a mother or a father, we might very well go to see that

14   person once a year.  There's nothing sinister about it.  His

15   passport is an American passport.  He is an American citizen.

16   He's gone once a year.

17           But all the other relatives are here.  His brothers

18   are here, his sisters are here, his three children are here,

19   his girlfriend is here.  He has jobs here.  He went tenth grade

20   at Lawrence High School.  He's lived in Lawrence his entire

21   life since he's come here.  His roots are here.

22           His work and employment history is here and he has

23   always worked, your Honor.  I presented to the Probation

24   Officer the slips that show that he has worked, and I will give

25   copies now to your Honor and to Ms. Ferguson.  I have the

1    originals if your Honor wishes to see them, but because they're

2    records he may need for tax purposes, I simply copied --

3              THE COURT:  Copies will suffice.  Thank you.

4              MR. KRASNOO:  But I also showed the originals to

5    Ms. Perry (PHONETIC) so that there would be no question as to

6    their veracity, your Honor.

7              This is a guy who works hard, your Honor.  He helps to

8    support the children.  That's basically what he does.  I think

9    that the conditions set out in the Pretrial Services Report are

10   conditions that he can certainly do.

11             His passport, by the way, your Honor, is already in

12   the possession of the drug authorities.  Whether it's been

13   turned over to Probation or the Federal Government, I have no

14   knowledge of, but his passport was seized on the day of the

15   warrant, okay.  I assume the Government would want it as some

16   evidence to show identity of him and the room, and the other

17   documents were seized.  So as far as number five of their

18   suggestion, it's already been accomplished in some way, that

19   his passport is surrendered.

20             With regard to travel, there's no problem restricting

21   it here.  He can't go anywhere out of the country if the

22   passport is surrendered.  All the rest of it, your Honor, he

23   can absolutely accomplish and provide.

24             I point out, your Honor, with no prior criminal

25   record, there's no reason to presume that he is a fugitive or

1     someone who would flee, and he doesn't have either the means

2     economically, or the capacity mechanically or practically, to

3     flee.

4            Once again, I point out, although your Honor has

5     rejected it for probable cause, that the evidence is pretty

6     scanty to suggest that it's his drugs and his use of the drugs

7     and his use of guns that warranted as an inference.  It may be

8     a logical inference, but it's certainly not the only logical

9     inference that can be done with this, especially since, your

10    Honor, if we look at the larger scheme, it's Esperitusanto who

11    leads them to 3 Newton through their investigation.  They know

12    nothing of Mr. Berroa up to that point, okay.  And when they

13    execute the search warrant, that's the first time they find

14    this man and he's sleeping in a bed.

15           I point out further that if he were the sentry for

16    drugs, as your Honor suggested as part of the explanation, that

17    the guns are not loaded.  If he's going to be protecting a

18    large quantity of Fentanyl, he ought to be doing it with some

19    degree of weaponry or alertness that allows that stash to be

20    protected for drug sales, and there's nothing to show that

21    that's what he's doing at the time the agents arrive.

22           Had he not been physically present in the apartment at

23    that time, your Honor, it would be nothing to have suggested

24    that he is connected to this conspiracy in any way.  So it's

25    merely the fortuity --

```
1              THE COURT:  Can you tell me why you proposed the other
2     sister's address?
3              MR. KRASNOO:  I'm sorry, I can't hear.
4              THE COURT:  As I understand it, you're proposing a
5     release to Isabella?
6              MR. KRASNOO:  Yes, your Honor.
7              THE COURT:  And why is that?
8              MR. KRASNOO:  Isabella is his sister.  She does not
9     live in public housing.  We've checked on that.  As far as I
10    understand, she has no dog and she has no weapons on the
11    premises.  She's got no prior criminal record, is my
12    understanding, so she certainly can be checked on to make a
13    determination that she would be an appropriate person for him
14    to live with.
15             THE COURT:  Okay.  Is there anything else the
16    Government wants to add?
17             MS. FERGUSON:  No, your Honor.  Thank you.
18             THE COURT:  Alright.  I'm going to take the issue of
19    pretrial detention under advisement.
20             MR. KRASNOO:  I'm --
21             THE COURT:  I'm going to take it under advisement.  I
22    will make a decision in the next few days and let you know.
23    And if I want -- I'm going to meet with Probation now.
24             Is Isabella here?
25             MR. KRASNOO:  Yes.
```

1          THE COURT:  Alright.  Why don't you -- you haven't had

2     an opportunity to interview her, have you?

3          THE PROBATION OFFICER:  No, your Honor.

4          THE COURT:  Well, why don't you take advantage of that

5     now and let me at least gather some information.

6          So I'm going to authorize Probation to speak with, if

7     she wants to, Isabella, so I have a better sense of what the

8     proposed arrangement is.

9          (Pause.)

10          MR. KRASNOO:  She would need an interpreter, your

11     Honor, one of the members of the family, but we've got the best

12     interpreter in not only this building, but I'd suggest probably

13     in Massachusetts to do it, if he's available.

14          THE COURT:  You're not translating, but he's laughing.

15     So I'm thinking he's understanding.

16          (Pause.)

17          THE COURT:  If you're available to help, please do,

18     and if not, you can use a family member.  Whatever works best.

19          Okay.  Once I have that information, I'll put it all

20     together and I'll make a decision.  Thank you.

21          MR. KRASNOO:  Thank you.

22          MS. FERGUSON:  Thank you.

23

24          (The hearing was concluded.)

25

<u>C E R T I F I C A T I O N</u>

I, Karen M. Aveyard, Approved Federal Court Transcriber, do hereby certify that the foregoing transcript, consisting of 39 pages, is a correct transcript prepared to the best of my skill, knowledge and ability from the official digital sound recording of the proceedings in the above-entitled matter.

<u>/s/ Karen M. Aveyard</u>
Karen M. Aveyard

<u>April 4, 2019</u>
Date



From: ECFnotice@mad.uscourts.gov
Subject: Activity in Case 1:19-mj-05051 USA v. Berroa Transcript
Date: April 5, 2019 at 10:50 AM
To: CourtCopy@mad.uscourts.gov

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

United States District Court

District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 4/5/2019 at 10:48 AM EDT and filed on 4/5/2019
**Case Name:**      USA v. Berroa
**Case Number:**    1:19-mj-05051
**Filer:**
**Document Number:** 11

**Docket Text:**
**Transcript of Detention Hearing as to Luis Berroa held on March 19, 2019, before Magistrate Judge Judith G. Dein. No Reporter Used. Digital Recording transcribed by Karen Aveyard. The Transcript may be purchased through Karen Aveyard at k.aveyard@comcast.net, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 4/26/2019. Redacted Transcript Deadline set for 5/6/2019. Release of Transcript Restriction set for 7/5/2019. (Scalfani, Deborah)**


**1:19-mj-05051-1 Notice has been electronically mailed to:**

James B. Krasnoo     jkrasnoo@kkf-attorneys.com, bchaput@kkf-attorneys.com

Katherine H. Ferguson    katherine.ferguson@usdoj.gov, alyssa.dipaolo@usdoj.gov, usama.ecf@usdoj.gov

**1:19-mj-05051-1 Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=4/5/2019] [FileNumber=8180482-0]
[2c03450ac3778bbe6a3bdb3f664990c4d340c2dd37a6b1d478312260e98aecec065e
dbb3e9f2184c5c792d2ae33cd109308c90bdf556faf8ae48e1aea23208eb]]



**From:** ECFnotice@mad.uscourts.gov
**Subject:** Activity in Case 1:19-mj-05051 USA v. Berroa Notice of Filing of Official Transcript
**Date:** April 5, 2019 at 10:50 AM
**To:** CourtCopy@mad.uscourts.gov

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### United States District Court

### District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 4/5/2019 at 10:49 AM EDT and filed on 4/5/2019
**Case Name:**       USA v. Berroa
**Case Number:**      1:19-mj-05051
**Filer:**
**Document Number:** 12(No document attached)

**Docket Text:**
**NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah)**

**1:19-mj-05051-1 Notice has been electronically mailed to:**

James B. Krasnoo    jkrasnoo@kkf-attorneys.com, bchaput@kkf-attorneys.com

Katherine H. Ferguson    katherine.ferguson@usdoj.gov, alyssa.dipaolo@usdoj.gov, usama.ecf@usdoj.gov

**1:19-mj-05051-1 Notice will not be electronically mailed to:**